Filed 10/30/15  P. v. Cristobal CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN JOSHUA CRISTOBAL,<br><br>Defendant and Appellant. | C072061<br><br>(Super. Ct. No. 11F06197) |

Defendant John Joshua Cristobal drove his car with a 0.18 percent blood alcohol content and caused a collision that resulted in serious injuries to Alyssa Calonge and Ryan Smrekar.  A jury convicted him of driving while under the influence of alcohol and causing bodily injury (count one), driving with a blood alcohol content of 0.08 percent or more and causing injury (count two), and failing to stop at the scene of an accident involving property damage (count three).  The jury found true the allegations that defendant personally inflicted great bodily injury on Calonge and Smrekar, proximately

1

caused bodily injury to more than one victim while he drove under the influence of alcohol, and willfully drove a motor vehicle with a blood alcohol content of 0.15 percent or more. The trial court sentenced defendant to an aggregate prison term of 10 years.

Defendant now contends (1) his statements to a law enforcement officer at the scene of the collision are inadmissible because they are the product of a custodial interrogation, and the officer did not give him the warnings required by *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*); (2) the trial court abused its discretion in excluding third party culpability evidence; and (3) the judgment must be reversed because of prejudicial juror misconduct.

We conclude (1) *Miranda* warnings were not required because, considering the totality of the circumstances surrounding the incident, defendant was not in custody when he made the statements to the officer; (2) any error in excluding the proffered third party culpability evidence was harmless beyond a reasonable doubt; and (3) defendant forfeited his juror misconduct claims because he did not object in the trial court on the grounds raised on appeal.

We will affirm the judgment.

## BACKGROUND

### A

Defendant went to a Sacramento nightclub with Milton Brott and Lance Fletcher to celebrate Brott's birthday. Defendant drove Brott and Fletcher to the nightclub in his white Mercedes Benz. Brott and defendant shared a bottle of vodka with others who met them at the nightclub. Fletcher did not drink any alcohol.

Brott, Fletcher, and defendant left the nightclub around 2:00 a.m. Brott and defendant were drunk. Defendant got into the driver's seat of his car, Brott sat in the front passenger seat, and Fletcher sat in the back seat behind Brott.

Defendant drove southbound on 15th Street and then turned eastbound into the westbound lane of Capitol Avenue. At some point Fletcher saw a car coming toward

2

defendant's car. Defendant swerved, and his car went up onto the curb and hit a sign. Defendant then swerved back onto the street. Defendant did not stop the car.

Fletcher was scared. He said, "Let's get a taxi. Let's just pull over and get a taxi." Defendant did not respond. Fletcher then told defendant there was a police vehicle behind them and to stop. Instead of stopping, defendant accelerated above freeway speed. Fletcher yelled at defendant to pull over and tried to wake Brott. Defendant did not respond to Fletcher's screaming.

Fletcher felt defendant's car hit something. Police later determined defendant's car hit the side of a parked car. Fletcher felt defendant's car "catch air" and then hit something again. It was later determined the Mercedes Benz ultimately hit the back of Alyssa Calonge's parked Toyota Tacoma pickup truck. Fletcher got out of the car after the collision.

B

California Highway Patrol Officer Mark Thompson was in a marked patrol vehicle at about 1:48 a.m. He saw a white Mercedes Benz, later determined to be defendant's car, travel southbound on 15th Street and then turn eastbound onto the westbound lane of Capitol Avenue. The car went up onto the sidewalk and knocked over a stop sign.

Defendant's car traveled toward Officer Thompson's patrol vehicle, forcing the officer to make a hard right to avoid a head-on collision. Defendant's car did not slow down or make any evasive action. Defendant's car turned back onto 15th Street. Officer Thompson did not see the face of the Mercedes Benz driver but saw that the driver wore a white shirt.

Officer Thompson turned on the overhead and flashing lights of his patrol vehicle. Defendant's car accelerated. Officer Thompson accelerated to 50 or 60 miles per hour, but he could not catch up to defendant's car. At one point, Officer Thompson lost sight of the car. Officer Thompson heard what sounded like a collision and then saw smoke,

3

debris, and what looked like an explosion ahead of him.  He saw a blue pickup truck that appeared to have been involved in a collision.

Officer Thompson parked his patrol vehicle behind the pickup truck.  He immediately went to the truck and saw a man and a woman on the floorboard of the truck.  Two off-duty paramedics assisted with the occupants of the truck.

Officer Thompson then walked to defendant's car.  He saw Brott pinned inside the car.  The speedometer was stuck at 80 miles per hour.  Officer Thompson saw defendant in a grassy area in front of the Mercedes Benz.  Officer Thompson asked defendant if he was okay and defendant said "yes."  Officer Thompson asked defendant to walk to a nearby bus stop and to sit down.  Defendant complied without assistance.  Officer Thompson then asked defendant if he was the driver of the Mercedes Benz.  Defendant answered "yes."  Officer Thompson placed defendant in handcuffs.

C

Calonge and the other occupant of the truck, Ryan Smrekar, suffered various injuries as a result of the accident.  Smrekar was in the hospital for seven days.  Fletcher and Brott were also injured.

Defendant had a 0.18 percent blood alcohol level.  The People's expert on forensic alcohol analysis and the effects of alcohol opined a person with a 0.18 percent blood alcohol level is too impaired to drive safely.  The expert said a man weighing 174 pounds who had a 0.18 percent blood alcohol content would have the equivalent of eight alcoholic drinks in his system.  Assuming all of the alcohol was fully absorbed, the same person would have approximately 0.21 percent blood alcohol content (or the equivalent of nine and half alcoholic drinks in his system) at 1:50 a.m. if he had a 0.18 percent blood alcohol content at 3:20 a.m.  Defendant weighed approximately 174 pounds.  A nurse obtained a blood sample from defendant at 3:20 a.m.

Brott was very reluctant to testify at the trial because he considered defendant a friend.  Brott said Fletcher at times had a reputation for lying.  But Brott said defendant

4

told him "I fucked up" when defendant visited Brott at the hospital. Defendant apologized to Brott for what happened. Defendant said he wanted to apologize to the people in the pickup truck, but his attorney told him he should not do that.

Sacramento Police Detective James Anderson testified as an expert on major collisions for the People. He opined, based on his interviews with witnesses, the photographs taken at the collision scene, and the physical evidence, that Calonge's pickup truck was parked when defendant's car collided with it. Defendant's expert on accident reconstruction and occupant kinematics, Dean Reichenberg, agreed the pickup truck was parked at the time of the collision.

Reichenberg concluded the right front portion of defendant's car hit the back of the pickup truck. He said there was nothing in the roadway that caused defendant's car to veer toward the pickup truck. The collision pushed the pickup truck forward and caused it to turn 180 degrees, jump the curb, and strike a large tree. Reichenberg also opined the Sacramento Police Department failed to collect all of the evidence, including body fluid and fabric imprints from the windshield and steering wheel of the Mercedes Benz.

Reichenberg further opined, based on his review of defendant's medical records and the physical evidence, that he could not conclude defendant was the driver of the Mercedes Benz at the time of the collision. He said defendant suffered injuries that were consistent with defendant being in the driver's seat or in the rear passenger seat at the time of the collision. Reichenberg agreed, however, that no physical evidence excluded defendant as the driver.

Defendant attacked the accuracy of the police reports by Sacramento Police Officers Ethan Hanson and Jonathan Gresham. The statements in Officer Hanson's report about Smrekar's location and the officer's arrival time at the hospital, where he observed defendant's blood draw, were incorrect. Officer Gresham's report incorrectly stated the pickup truck was moving at the speed of 30 miles per hour at the time of the collision.

5

Defendant also presented evidence that he was from the Philippines, English was not his native language, and he had problems communicating in English at times. But defendant spoke English and did not require an interpreter during the trial.

The jury found defendant guilty of driving under the influence of alcohol while doing an act forbidden by law and causing bodily injury to another (Veh. Code, § 23153, subd. (a) -- count one);[1] driving with 0.08 percent or more, by weight, of alcohol in his blood while doing an act forbidden by law and causing bodily injury to another (§ 23153, subd. (b) -- count two); and failing to stop after causing property damage (§ 20002, subd. (a) -- count three). The jury also found true allegations that defendant personally inflicted great bodily injury on Calonge and Smrekar (Pen. Code, § 12022.7, subd. (a)), proximately caused bodily injury to more than one victim (§ 23558), and willfully and unlawfully drove a motor vehicle with 0.15 percent or more by weight blood alcohol concentration (§ 23578).

The trial court sentenced defendant to an aggregate term of 10 years in prison, consisting of the following: on count one, the middle term of two years plus a consecutive six years for the Penal Code section 12022.7 enhancements and a consecutive two years for the section 23558 enhancements; and on count two, the middle term of two years, stayed pursuant to Penal Code section 654.

Additional facts are set forth in the discussion as relevant to defendant's contentions on appeal.

DISCUSSION

I

Defendant contends his statements to Officer Thompson at the scene of the collision are inadmissible because they are the product of a custodial interrogation, and

---

[1] Undesignated statutory references are to the Vehicle Code.

6

Officer Thompson did not give defendant the warnings required by *Miranda, supra,* 384 U.S. 436 [16 L.Ed.2d 694].

A

Defendant moved in limine to exclude evidence of his statements to Officer Thompson at the accident scene. The trial court conducted an Evidence Code section 402 hearing at defendant's request. Officer Thompson, the sole witness at the hearing, testified as follows: He pursued a white Mercedes Benz sedan at about 1:48 a.m. He saw an explosion and things flying in the air when he was at about P Street. There was a Toyota pickup truck that appeared to be involved in a collision. He stopped his patrol vehicle and checked on the occupants of the truck. He then walked to the Mercedes Benz, which was stopped near a bus stop bench at the intersection of 15th and S Streets. The Mercedes Benz was the same car the officer had been chasing. He saw defendant in the grass near the Mercedes Benz. He asked defendant if he was okay. Defendant responded "yes." Officer Thompson asked defendant if he could get up and defendant got up. Officer Thompson directed defendant to the bus stop bench and defendant walked without assistance. Officer Thompson asked defendant to sit on the bench and defendant complied. Officer Thompson did not touch defendant. Officer Thompson asked if defendant had been driving the Mercedes Benz. Defendant appeared to understand the question and responded "yes." Officer Thompson immediately handcuffed defendant after defendant said he was the driver. There was no other officer at the scene. Officer Thompson left defendant on the bus bench and checked on the front seat passenger of the Mercedes Benz.

After hearing argument from counsel, the trial court denied defendant's motion to exclude his statements to Officer Thompson. The trial court ruled that Officer Thompson was not required to give defendant *Miranda* advisements at the time defendant admitted he was the driver, because defendant was not in custody at that time and Officer Thompson did not interrogate defendant. The trial court said preliminary questions asked

7

during a driving under the influence investigation, such as "were you the driver," do not implicate *Miranda*.

B

"To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the *Miranda* Court held, [individuals] interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." (*Thompson v. Keohane* (1995) 516 U.S. 99, 107 [133 L.Ed.2d 383, 391].) "The purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing, [and] to relieve the ' "inherently compelling pressures" ' generated by the custodial setting itself, ' "which work to undermine the individual's will to resist" ' . . ." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 433 [82 L.Ed.2d 317, 330], italics omitted.) The People may not use statements obtained in violation of *Miranda* to establish guilt. (*Id.* at p. 428 [82 L.Ed.2d at p. 328].)

*Miranda* warnings are required only when a defendant is in custody. (*Stansbury v. California* (1994) 511 U.S. 318, 322 [128 L.Ed.2d 293, 298]; *Miranda, supra*, 384 U.S. at pp. 444, 478-479 [16 L.Ed.2d at pp. 706, 726].) An interrogation is custodial when the defendant is placed under arrest or his freedom of movement is restrained to the degree associated with a formal arrest. (*California v. Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1400 (*Leonard*).) The test for whether a person is in custody is an objective one. (*Stansbury v. California, supra*, 511 U.S. at p. 323 [128 L.Ed.2d at p. 298]; *Leonard, supra,* 40 Cal.4th at p. 1400.) "When there has been no formal arrest, the question [in determining whether a defendant is in custody] is how a reasonable person in the defendant's position would have understood his situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, . . .

8

and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 395 (*Moore*).) We do not consider the subjective views harbored by the police officer and the person being questioned. (*Stansbury v. California, supra*, 511 U.S. at p. 323 [128 L.Ed.2d at p. 298].) An investigating officer's suspicions or beliefs are relevant to our inquiry only if the suspicions or beliefs are communicated to the defendant and would have affected how a reasonable person in the defendant's position would perceive his freedom to leave or if such evidence is relevant in testing the credibility of the officer's account of what happened during the interrogation. (*Id.* at pp. 323-325 [128 L.Ed.2d at pp. 298-300]; *People v. Stansbury* (1995) 9 Cal.4th 824, 830.)

In determining whether defendant was subjected to custodial interrogation, we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. (*People v. Thomas* (2011) 51 Cal.4th 449, 476 (*Thomas*).) We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was obtained in violation of *Miranda*. (*Moore, supra,* 51 Cal.4th at p. 395; *Thomas, supra,* 51 Cal.4th at p. 476.) We review the correctness of the trial court's ruling at the time it was made, not by reference to evidence produced at a later date. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1007, fn. 23; *People v. Welch* (1999) 20 Cal.4th 701, 739; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 243.)

A defendant is not in police custody merely because he is temporarily detained by police. (*Thomas, supra,* 51 Cal.4th at pp. 475-477; *In re Joseph R.* (1998) 65 Cal.App.4th 954, 957-958.) For example, roadside questioning during a routine traffic stop is not custodial interrogation. (*Berkemer v. McCarty, supra*, 468 U.S. at p. 435, 437-440 [82 L.Ed.2d at pp. 331, 333-335].)

In *Berkemer v. McCarty*, a highway patrol officer stopped a car after observing it weave in and out of a lane. (*Id.* at p. 423 [82 L.Ed.2d at p. 324].) The defendant had difficulty standing when he got out of the car. (*Ibid.*) The officer decided the defendant

9

would be charged with a traffic offense; however, the officer did not tell the defendant he would be taken into custody. (*Ibid.*) Without advising the defendant of his *Miranda* rights, the officer asked the defendant whether he had been using intoxicants. (*Ibid.*) The defendant said he had two beers and smoked marijuana a short time before. (*Ibid.*) The officer placed the defendant under arrest. (*Ibid.*) The United States Supreme Court concluded the defendant was not in custody within the meaning of *Miranda* until he was placed under arrest; therefore, his pre-arrest statements were admissible against him. (*Berkemer v. McCarty, supra*, 468 U.S. at p. 442 [82 L.Ed.2d at p. 336].) The Supreme Court reasoned that only a short period of time elapsed between the initial traffic stop and the arrest. (*Id.* at p. 441 [82 L.Ed.2d at p. 336]) A single officer asked the defendant a modest number of questions at a location visible to passing motorists. (*Id.* at 442 [82 L.Ed.2d at p. 336].) And although the officer decided to arrest the defendant as soon as he stepped out of his car, the officer did not tell the defendant he would be taken into custody. (*Ibid.*) The Supreme Court said treatment of this sort cannot fairly be characterized as the functional equivalent of a formal arrest. (*Ibid.*; see *Pennsylvania v. Bruder* (1988) 488 U.S. 9, 10-11 [102 L.Ed.2d 172, 176-177] [pre-arrest questioning during roadside, driving under the influence investigation does not involve custody for purposes of *Miranda*]; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753-1754 [detaining the defendant at a secondary location pursuant to a possible driving under the influence investigation did not result in placing the defendant in custody for purposes of *Miranda*].)

People v. Bellomo* (1992) 10 Cal.App.4th 195 (*Bellomo*) also involved whether on-the-scene questioning constituted custodial interrogation. In that case, a car co-owned by defendant and his brother struck two parked cars. (*Id.* at p. 197.) One of the issues at trial was whether the defendant was the driver. (*Ibid.*) An evidentiary hearing disclosed that a paramedic had informed the first officer on the scene that defendant exited the car from the driver's side. (*Id.* at p. 198.) The officer saw defendant sitting on a curb

slumped over and asked him whether he was the driver. (*Ibid.*) The defendant denied he was the driver. (*Ibid.*) At trial, the defendant argued the officer should have read him his *Miranda* rights before asking him whether he was driving. (*Ibid.*)

The Court of Appeal rejected the claim that asking the defendant whether he was the driver was an accusatory question. (*Bellomo, supra*, 10 Cal.App.4th at p. 199.) The court said the officer simply inquired whether the defendant was driving in order to reconstruct what had happened. (*Ibid.*) The appellate court also noted the officer did not communicate any suspicion that the defendant was responsible for the collision and did not exert any effort to detain the defendant. (*Id.* at p. 200.) The appellate court held the officer's question did not transform the accident investigation into custodial interrogation. (*Ibid.*)

Here, Officer Thompson was the only officer on scene when he spoke to defendant. Defendant claims the dispositive factors in this custodial analysis are whether Officer Thompson's investigation focused on defendant and whether Officer Thompson intended to arrest defendant. But as we have explained, an officer's unexpressed intent has no bearing on whether the defendant is in custody. (*Stansbury v. California, supra*, 511 U.S. at p. 326 [128 L.Ed.2d at p. 301] ["any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*"]; *Berkemer v. McCarty, supra*, 468 U.S. at p. 442 [82 L.Ed.2d at p. 336]; *People v. Stansbury, supra*, 9 Cal.4th at p. 830 & fn. 1.) There is no indication Officer Thompson communicated to defendant that he suspected defendant caused the collision.[2] There is

---

[2] There is no evidence at the Evidence Code section 402 hearing that Officer Thompson suspected defendant was the driver when Officer Thompson questioned defendant. Officer Thompson subsequently testified the driver's side window of the Mercedes Benz passed the driver's side window of his patrol vehicle and he saw the driver of the

also no indication the officer told defendant he would be detained or arrested before defendant admitted he was the driver. It does not appear the officer was aggressive, confrontational, or accusatory when he spoke with defendant. As the trial court found, the officer was simply conducting a traffic collision investigation. (*Bellomo, supra*, 10 Cal.App.4th at pp. 199-200.)

Additionally, Officer Thompson did not physically restrain defendant. Although Officer Thompson did not state how much time passed after he first contacted defendant and before defendant admitted he was driving, the interaction between Officer Thompson and defendant does not appear to have been protracted. And the interaction occurred on a public roadway, where other people were present. (*Berkemer v. McCarty, supra*, 468 U.S. at pp. 438-439 [82 L.Ed.2d at p. 334] [the fact that questioning occurs in public view and the detained motorist is interviewed by a single officer ameliorates the concerns in *Miranda*].)

*People v. Herdan* (1974) 42 Cal.App.3d 300 (*Herdan*) and *People v. Bejasa* (2012) 205 Cal.App.4th 26 (*Bejasa*), cases defendant likens to this one, are distinguishable. In *Herdan*, two police officers and four other police units conducted surveillance of a suspected narcotics transaction. (*Herdan, supra,* 42 Cal.App.3d at p. 303.) A police informant gave a prearranged signal to police indicating the presence of narcotics in the trunk of the defendant's car. (*Ibid.*) Officers followed defendant, the informant, and defendant's associate to the informant's house where two police officers rushed over and accosted defendant and his associate. (*Id.* at pp. 303-304.) One car blocked the defendant's car. (*Id.* at p. 304, fn. 3.) Various other officers approached defendant. (*Ibid.*) One officer pointed a gun at the defendant. (*Ibid.*) The defendant was

Mercedes Benz wore a white shirt. But no such evidence was presented when the trial court made the challenged ruling.

frisked for weapons before he was questioned.  (*Ibid.*)  An officer identified himself and asked defendant if he had any narcotics in his car.  (*Id.* at p. 304.)

In *Bejasa,* the defendant drove a vehicle that collided with another vehicle. (*Bejasa, supra,* 205 Cal.App.4th at p. 32.)  Defendant told the first police officer at the scene he was the driver.  (*Ibid.*)  Defendant also admitted he was on parole.  (*Ibid.*) He consented to a search, during which the officer found two syringes.  (*Ibid.*)  One of the syringes contained a small amount of liquid.  (*Id.* at p. 33.)  The defendant admitted he used the syringe to ingest methamphetamine.  (*Ibid.*)  The officer told the defendant he was being detained for a possible parole violation, handcuffed him, and placed him in the back of a patrol car.  (*Ibid.*)  A second officer later took defendant out of the patrol vehicle, removed the handcuffs, and interviewed the defendant.  (*Ibid.*)  The defendant made a number of incriminating statements about his drug use to the second officer. (*Ibid.*)  On appeal, the defendant challenged the admissibility of his statements to the second officer only.  (*Id.* at p. 34.)  The Court of Appeal said it was less likely defendant was exposed to custodial pressures when the first officer interviewed him because that officer was gathering information about what had occurred, rather than questioning defendant as a suspect.  (*Id.* at p. 37.)  However, the defendant was placed in custody when he was restrained and the first officer told him he was being detained for a possible parole violation.  (*Id.* at pp. 37-38.)  Accordingly, the defendant's statements to the second officer, which were given without *Miranda* warnings, were inadmissible.  (*Id.* at pp. 31-34.)

The show of force in *Herdan* and the circumstances that would have led the defendants in *Herdan* and *Bejasa* to reasonably believe they were not free to leave are absent here.  There were no indicia of arrest and there was no coercive environment present when defendant told Officer Thompson he drove the Mercedes Benz.

Considering the totality of the circumstances as presented to the trial court, we conclude defendant was not in custody when he admitted he drove the Mercedes Benz.

The trial court did not err in admitting defendant's statements to Officer Thompson. We need not consider whether Officer Thompson "interrogated" defendant for purposes of *Miranda* because defendant was not in custody when he made the challenged statements.

II

Defendant next claims the trial court abused its discretion in excluding third party culpability evidence, namely Reichenberg's opinion that Fletcher's injuries indicate Fletcher could have been the driver of the Mercedes Benz.

A

Defendant retained Reichenberg to determine the seating positions of defendant and Fletcher at the time of the collision. Reichenberg concluded the identity of the driver of the Mercedes Benz could not be determined from an examination of the available physical evidence. He said both defendant and Fletcher sustained injuries that were consistent with being the driver, and their injury patterns were also consistent with being the right rear passenger.

The People moved in limine to exclude Reichenberg's opinion as inconclusive and therefore irrelevant and insufficient foundation for third party culpability evidence. The People further argued Reichenberg's opinion should be excluded under Evidence Code section 352 because it would add confusion and cause the jury to speculate.

Defense counsel clarified that Reichenberg would not place someone else in the driver's seat. Rather, the expert's opinion would cast doubt on the People's case that defendant was the driver.

The trial court was initially inclined to deny the People's motion, finding the proffered evidence relevant. It said Reichenberg's opinion was "very probative" even if there was "some prejudicial impact." However, after determining there was no other evidence to suggest that anyone other than defendant was the driver and after reviewing cases on third party culpability, the trial court subsequently granted the People's motion.

14

The trial court said Reichenberg's opinion was pure speculation. And the fact that there was a possibility Fletcher could be the driver was not enough to admit Reichenberg's opinion as third party culpability evidence. The trial court ruled Reichenberg could testify he did not believe defendant was the driver, but he could not opine Fletcher could have been the driver, unless there was some other evidence supporting that conclusion. The trial court did not rule whether the proffered testimony by Reichenberg was inadmissible under Evidence Code section 352.

B

Even if the trial court abused its discretion in excluding Reichenberg's expert opinion that either defendant or Fletcher could have been the driver of the Mercedes Benz, the error was harmless either under the *People v. Watson* (1956) 46 Cal.2d 818 or the *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] standard of review. There was overwhelming evidence defendant was the driver of the Mercedes Benz. Defendant was the registered owner of the car. Fletcher, the only sober person in the car, testified defendant drove the Mercedes Benz after the group left the nightclub. The collision occurred minutes later. Physical evidence and Officer Thompson's observations of the Mercedes Benz corroborate Fletcher's detailed account. Fletcher's testimony that he felt the Mercedes Benz hit something before it hit another object is supported by evidence that the Mercedes Benz hit a parked car before it collided with Calonge's truck. Officer Thompson saw that the driver of the Mercedes Benz wore a white shirt. Fletcher wore a plaid shirt. Defendant was wearing a white shirt on the day of the collision. Moreover, defendant admitted he was the driver of the Mercedes Benz. Defendant also admitted culpability to Brott. Reichenberg's findings did not establish that Fletcher, and not defendant, was driving the Mercedes Benz when it collided with Calonge's pickup truck.

Defense counsel urged the jury to find that the People failed to prove beyond a reasonable doubt that defendant was driving the Mercedes Benz at the time of the

15

collision. Defense counsel said the fact that defendant owned the Mercedes Benz did not mean defendant was driving when the collision occurred because "[t]here are designated drivers" and "[p]eople drive other people's cars all the time." He pointed out Fletcher knew how to drive. Defense counsel highlighted Reichenberg's finding that it could not be determined, from the physical evidence, whether defendant was the driver. Defense counsel pointed out Fletcher had injuries to his left clavicle and abrasions to the tops of his hands. And Reichenberg said abrasions to the hands and the left clavicle area are common injuries a driver can suffer in a collision. Defense counsel argued the jury should not rely on defendant's admission because defendant had a 0.21 percent blood alcohol content, he was confused after the collision, and it was not known what question Officer Thompson asked defendant when defendant responded "yes." Defense counsel also attacked the police investigation, Officer Thompson's belated memory about seeing the driver of the Mercedes Benz in a white shirt, and Fletcher and Brott's credibility. But the jury rejected the argument that defendant was not driving when the collision occurred.

On this record, even if the trial court erred in excluding Reichenberg's proffered opinion, the error was harmless beyond a reasonable doubt.

### III

Defendant further claims Juror No. 1 committed prejudicial misconduct by failing to disclose, during voir dire, that he knew one of the People's witnesses, and the trial court erred in failing to conduct a reasonable inquiry into juror bias and in failing to excuse Juror No. 1 for bias.

### A

The People called criminalist Chris Fogelberg as a witness on the second day of their case-in-chief. Juror No. 1 announced that he knew the witness immediately after Fogelberg entered the courtroom. Juror No. 1 did not disclose that he knew Fogelberg when the trial judge read the list of possible trial witnesses, including the name Chris Fogelberg, during voir dire.

16

The trial court questioned Juror No. 1 outside the presence of the jury but in the presence of defendant, his counsel, and the prosecutor. Juror No. 1 said he knew Fogelberg "[t]hrough multiple games of baseball and school, all school, with [his] son." Juror No. 1 explained he was Fogelberg's baseball coach for four or five years, rooted for Fogelberg at games, and attended one or two social outings in relation to baseball. Juror No. 1 did not recall Fogelberg's parents. He had not seen Fogelberg in nine or 10 years. He did not know Fogelberg worked at the crime lab.

Juror No. 1 recognized Fogelberg's name from the list of possible witnesses given during voir dire, but he was not sure the person on the list was the same person he knew. However, he recognized Fogelberg when he saw Fogelberg in the courtroom.

Juror No. 1 said he could be impartial and fair to both parties even though he coached Fogelberg and actively rooted for him in school. Juror No. 1 stated he could set aside any prior knowledge he had of Fogelberg and judge the case solely on the evidence presented and the law given by the judge. The trial resumed following an unreported discussion between the trial judge and counsel.

B

A trial court must make whatever inquiry is reasonably necessary to determine whether a juror should be discharged when the trial court is put on notice that the juror may be unable to perform his duty to render an impartial verdict. (*People v. Martinez* (2010) 47 Cal.4th 911, 941; *People v. McNeal* (1979) 90 Cal.App.3d 830, 838-839.) The scope of any inquiry and the ultimate decision whether to discharge a juror are committed to the sound discretion of the trial court. (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.)

Defendant says the trial court should have inquired about (1) why Juror No. 1 did not disclose, during voir dire, that he may know Fogelberg; (2) Fogelberg's relationship with Juror No. 1's son, (3) any other contact Juror No. 1 had with Fogelberg, and (4) Juror No. 1's current feelings toward Fogelberg. But defendant did not object on the record to the scope of the trial court's inquiry into possible misconduct by Juror No. 1.

17

Defendant's failure to seek, in the trial court, a more extensive inquiry of Juror No. 1 or in any other way to object to the trial court's course of action deprived the trial court of the opportunity to consider arguments for conducting further examination and to avoid or correct any errors. Defendant's omission in the trial court forfeits his appellate claim. (*People v. Holloway* (2004) 33 Cal.4th 96, 126-127.)

In any event, defendant's claim fails on the merits because the trial court's questioning of Juror No. 1 covered the issues defendant identifies on appeal. During questioning by the trial judge, Juror No. 1 said he recognized Fogelberg's name but was uncertain whether the potential trial witness was the same Chris Fogelberg he knew. It appears because he was uncertain whether he knew the Chris Fogelberg who may be a witness at the trial, Juror No. 1 did not make a disclosure during voir dire but instead followed the trial court's voir dire instruction to inform the trial judge if he recognized Fogelberg during the trial. With regard to the nature of Fogelberg's relationship with Juror No. 1's son, Juror No. 1 said Fogelberg went to school and played baseball with Juror No. 1's son. Juror No. 1 last saw Fogelberg nine or 10 years ago. As for his current feelings toward Fogelberg, Juror No. 1 said he could be fair and impartial to both sides and he could set aside any prior knowledge he might have of Fogelberg and judge the case solely on the evidence presented and the instructions the trial court gave. The trial judge, who was able to observe Juror No. 1's demeanor and assess his veracity, accepted Juror No. 1's representations without any objection from the parties. The trial court did not abuse its discretion in deciding when to end the inquiry. (*People v. Ray* (1996) 13 Cal.4th 313, 343-344 [trial court did not abuse its discretion in concluding no further inquiry into possible juror bias or misconduct was necessary where record contained no evidence of juror bias].)

Defendant also argues the judgment must be reversed because Juror No. 1 engaged in misconduct, and the People cannot overcome the presumption of prejudice arising from the misconduct by Juror No. 1. Defendant argues, in the alternative, the judgment

18

must be reversed because the trial court abused its discretion in not excusing Juror No. 1 for bias which was inherent in Juror No. 1's relationship with Fogelberg.

A defendant has a constitutional right to a trial by impartial jurors. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *In re Boyette* (2013) 56 Cal.4th 866, 888 (*Boyette*).) " ' "The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution." ' " (*Boyette, supra,* 56 Cal.4th at p. 888.) " ' "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. [Citation.] Similarly, lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule . . . ." [Citation.] [¶] The ability of a defendant, either personally, through counsel, or by the court, to examine the prospective jurors during voir dire is thus significant in protecting the defendant's right to an impartial jury. Of course, the efficacy of voir dire is dependent on prospective jurors answering truthfully when questioned. As the United States Supreme Court has stated, "Voir dire examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." [Citation.] [¶] A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct. [Citations.] [¶] Without truthful answers on voir dire, the unquestioned right to challenge a prospective juror for cause is rendered nugatory. Just as a trial court's improper restriction of voir dire can undermine a party's ability to

19

determine whether a prospective juror falls within one of the statutory categories permitting a challenge for cause [citations], a prospective juror's false answers on voir dire can also prevent the parties from intelligently exercising their statutory right to challenge a prospective juror for cause. [¶] Such false answers or concealment on voir dire also eviscerate a party's statutory right to exercise a peremptory challenge and remove a prospective juror the party believes cannot be fair and impartial.' " (*Id.* at pp. 888-889, italics omitted.)

Juror No. 1 failed to disclose, during voir dire, that he may know the Chris Fogelberg who may be a witness at trial. Concealment of relevant facts is juror misconduct. (*Boyette, supra*, 56 Cal.4th at p. 889; *In re Hitchings* (1993) 6 Cal.4th 97, 111.) However, defendant did not assert an objection at trial that Juror No. 1 engaged in misconduct, and defendant did not move to excuse Juror No. 1. Defendant did not preserve his claims for review because he did not object in the trial court on the grounds raised on appeal. (*People v. Russell* (2010) 50 Cal.4th 1228, 1250 ["A claim of prejudicial misconduct is waived when the defendant fails to object to a juror's continued service and fails to seek a mistrial based upon prejudice."]; *People v. Dykes* (2009) 46 Cal.4th 731, 808, fn. 22 [failure to raise the issue of juror misconduct and seek relief from the court on that basis results in a forfeiture of the issue on appeal].)

Defendant's claims also fail on the merits because the record discloses no substantial likelihood that Juror No. 1 was actually biased against defendant. Juror misconduct raises a rebuttable presumption of prejudice. (*Boyette, supra*, 56 Cal.4th at p. 889.) The presumption is rebutted " 'and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant.' [Citation.] In other words, the test asks not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or

20

nondisclosure) evidences bias." (*Id.* at pp. 889-890, italics omitted.) "Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' " (*People v. Holt* (1997) 15 Cal.4th 619, 659.) We independently review whether prejudice arose from juror misconduct. (*People v. Nesler* (1997) 16 Cal.4th 561, 582.)

Considering the totality of the circumstances, there is no basis to conclude that Juror No. 1 was biased. As soon as he realized the Chris Fogelberg who the People called as a witness was the same Chris Fogelberg he knew, Juror No. 1 alerted the trial court. (*People v. Ray, supra*, 13 Cal.4th at p. 344 [if juror was biased against the defendant, common sense suggests he would not have voluntarily disclosed his connection to the victim after the victim testified].) There is no support in the record for defendant's assertion that Juror No. 1 had a "close personal relationship with" Fogelberg which would "naturally bias the juror in favor of the prosecution." Juror No. 1 had not seen Fogelberg for nine or 10 years. And nothing in the record supports defendant's speculation that Juror No. 1 may have influenced the other jurors' evaluation of Fogelberg's testimony. The fact the jury accepted Fogelberg's testimony does not evidence bias or improper influence by Juror No. 1. Defense counsel did not challenge Fogelberg's qualification to testify as an expert. Fogelberg said defendant had a 0.18 percent blood alcohol content. He opined a person with a 0.18 percent blood alcohol content is too impaired to drive safely. Defense counsel did not challenge the results of defendant's blood alcohol test or Fogelberg's opinion that a person with a 0.18 percent blood alcohol content is too impaired to drive safely. Defense counsel's closing statement focused instead on whether defendant was driving at the time of the collision.

Defendant is not entitled to relief based on juror misconduct.

## DISPOSITION

The judgment is affirmed.

/S/
_____
Mauro, J.

We concur:

/S/
_____
Raye, P. J.

/S/
_____
Duarte, J.